**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DIEGO IVAN GARDUNO PINA,

        Petitioner,

        v.

ERIKA CARBAJAL CHAVEZ,

        Respondent.

No. 25 CV 10337

Judge Georgia N. Alexakis

**MEMORANDUM OPINION AND ORDER**

Petitioner Diego Ivan Garduno Pina has filed a petition against Respondent Erika Carbajal Chavez, seeking the return of the parties' two sons, Minor A and Minor B, to Mexico, under the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (Oct. 25, 1980) (the "Convention"), implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*. The Convention provides that a parent whose child has been wrongfully removed or retained in the United States may petition for the child's return to his country of habitual residence.

Here, the parties agree that Minor A and Minor B were wrongfully removed from Naucalpan de Juarez, Mexico, in September 2024. The dispute therefore centers on the applicability of the "grave risk" exception. Under this exception, a child's return is not required if a respondent establishes, by clear and convincing evidence, that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 22 U.S.C. § 9003(e)(2)(A); Hague Convention, art. 13b.

In this opinion, the Court first summarizes the record. The Court then sets forth its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons it will set forth, the Court concludes that respondent has established by clear and convincing evidence that there is a grave risk that returning Minor A and Minor B to Mexico would expose them to physical or psychological harm or otherwise place them in an intolerable situation. The petition for the children's return is therefore denied.

## I.     Summary of Evidence

Following a period of expedited discovery [18], the Court held a three-day bench trial in December 2025 and January 2026. [31], [33], [37]. The parties presented testimony from respondent, petitioner, petitioner's mother, and petitioner's sister. Each of these witnesses testified via videoconference[1] and Spanish language interpreters. In addition, the Court received a report prepared by an appointed guardian ad litem following two interviews of Minor A and heard in-person testimony from the guardian ad litem. Finally, the parties provided the Court with a limited number of exhibits and entered into a series of stipulations. [30]. A summary of this evidence—as relevant to respondent's "grave risk" defense and to provide some additional context—follows.[2]

### A. Stipulations and Admissions

Petitioner and respondent are Mexican citizens and the biological parents of Minor A and Minor B. [30] ¶¶ 1, 9. Minor A is currently 9 years old; Minor B is currently 8 years old. *Id.* ¶¶ 3, 5. Both children lived solely in Mexico from the time of their births until September 2024. *Id.* ¶ 7.

When they lived in Mexico, the children lived with both parents. *Id.* ¶¶ 11, 14. Minor A and Minor B were removed from Mexico without petitioner's consent and acquiescence; at the time of their removal, petitioner was exercising his custody rights to both children; and at time of their removal, Mexico was Minor A's and Minor B's place of habitual residence. *Id.* ¶¶ 8, 13–14. In other words, petitioner has established a prima facie cause of action for the children's return. *See Hernandez v. Cardoso*, 844 F.3d 692, 694 (7th Cir. 2016) (elements of prima facie cause of action).

---

[1] Petitioner, petitioner's mother, and petitioner's sister are all located in Mexico and did not have the means or ability to travel to testify in-person. Respondent resides in this District but, at a December 2, 2025 status hearing, expressed reluctance, via counsel, about the prospect of traveling to the courthouse to testify in-person because the trial was scheduled to take place during a time when the federal government had increased immigration enforcement efforts. As the Court explained at hearings on December 2, 2025, and December 4, 2025, it did not permit respondent to testify via videoconference because of this asserted concern. Rather, the Court decided that it would "level the playing field"—from the vantage point of assessing credibility—if each of these witnesses testified under the same circumstances.

[2] The hearing transcripts can be found at [35], [36], and [40]. In this opinion, they are cited as [Dkt. Number] at [Page Number]. During the bench trial, the Court applied the Federal Rules of Evidence to determine admissibility. This is consistent with other hearings under the Hague Convention. *See, e.g., Ho v. Ho*, No. 20 C 6681, 2021 WL 2915161, at *2 (N.D. Ill. July 12, 2021).

On September 12, 2024, at approximately 4:30 a.m., petitioner woke up and left the family's home shortly thereafter to go to work. [16] ¶ 11. Minor A and Minor B did not attend school that day because of a school holiday. [30] ¶ 16. Respondent and petitioner spoke that day, and respondent told petitioner that "the children were okay." *Id.* ¶ 17. The next day, September 13, 2024, respondent sent petitioner photos of the children in front of a monument in Mexico City and, in response to a question from petitioner, said the children were fine. *Id.* ¶¶ 18–19.

Sometime after September 13, 2024, in response to an inquiry from petitioner's mother about the children, respondent sent petitioner's mother the same photos she had sent petitioner. *Id.* ¶ 20. Sometime after September 12, 2024, respondent sent petitioner a text message stating that the children were fine along with an audio message from Minor A and Minor B. *Id.* ¶ 22. In the audio message, Minor A asked petitioner "not to drink too much beer" and advised petitioner that they would return on September 16, 2024. *Id.* ¶ 22.

Respondent and the children did not return to petitioner. Instead, they made their way to the United States and ultimately took up residence in Aurora, Illinois. *Id.* ¶ 8.

## B. Respondent's Testimony

Respondent met petitioner in 2015 at a restaurant where they both worked as cooks. [36] at 35. Respondent worked at the restaurant for one year but did not return after giving birth to Minor A. *Id.* at 37. Initially, respondent and petitioner lived together at a location near petitioner's parents, *id.* at 36, but during the final months of her pregnancy with Minor A, respondent and petitioner moved into a two-room apartment within his parents' home, *id.* at 38. Then, in 2020, petitioner and respondent moved to a different home. *Id.* at 43. Their new home was approximately 10 minutes away, walking distance, from their old home, and had been built by petitioner's parents. *Id.* at 43–44.

Respondent described petitioner as someone with a temper, *id.* at 36, but also described their relationship, in its early days, as "normal" and "fine," *id.* at 40. After she and petitioner moved into his parents' home, though, respondent said the relationship turned abusive. *Id.* at 40–41. Respondent testified that throughout the remainder of their relationship, petitioner hit her "three or four times per week." *Id.* at 42. She detailed:

> He would slap me around. He would grab me by my neck and choke me. He would cover my mouth so that I wouldn't speak, so that I would not be able to scream. And he would squeeze really hard. He would push me … against the bed and hit me with whatever he was able to find.

3

*Id.* at 41. *See also id.* at 50 ("Every time that he would hit me he would also choke me."). According to respondent, the abuse occurred when she "didn't do something that [petitioner] wanted me to do or I did it badly." *Id.* at 49.

Respondent testified that petitioner sexually assaulted her "many times." *Id.* at 51. Although she could not remember specific dates when these assaults took place, respondent said she was pregnant with Minor A the first time that petitioner sexually assaulted her. *Id.* Respondent testified that petitioner "would "force his penis into my mouth and into my vagina also." *Id.*[3] Respondent grew quite emotional and cried during this portion of her testimony.

Respondent further testified that respondent was psychologically abusive:

> He would constantly threaten to kill me. That I was undeserving of anything. I was a woman that didn't deserve anything, that I was a piece of garbage. … He would say a lot of swearing and insulting words to me. … That I was stupid … he would call me a mother fucker. That he didn't give a shit about me in life. That … the life of an animal was worth a lot more than mine. That I didn't deserve a single thing in this world.

*Id.* at 42. According to respondent, petitioner would say these things "every day." *Id.*

The abuse, both physical and psychological, took place "very often" in front of Minor A and Minor B. *Id.* at 50. When the sexual assault occurred, the children were asleep but nearby. *Id.* at 51–52. Petitioner's mother and sister witnessed the psychological abuse. *Id.* at 50.

---

[3] At trial, petitioner sought to impeach respondent on her allegations of sexual abuse by pointing out that she did not specify that she suffered sexual abuse—in contrast with physical abuse, more broadly—when asserting the grave-risk defense in response to the petition. [36] at 71. The Court is not persuaded by this line of impeachment. A party is not required to lay out all facts supporting an affirmative defense. *Compare* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim *showing* that the pleader is entitled to relief) *with* Fed. R. Civ. P. 8(c) (requiring that a party only "affirmatively *state* any avoidance or affirmative defense) (emphases added). As the district court explained in *RBG Plastic, LLC v. Webstaurant Store*, "the plausibility-pleading standard erected by *Twombly* (and *Iqbal*, which elaborated on *Twombly*) does not apply to defenses and affirmative defenses. Instead, the statement of defenses and affirmative defenses must be enough to give 'fair notice,' but nothing more than that." No. 1:18-CV-05192, 2020 WL 7027601, at *4 (N.D. Ill. Nov. 30, 2020). Here, petitioner has not argued that respondent's allegations of physical and psychological abuse, *see* [16] at 10, did not give him fair notice of an allegation of sexual abuse. The Court also finds that allegations of sexual abuse are encompassed within allegations of physical abuse.

According to respondent, petitioner also abused the children, although less frequently than he abused respondent. *Id.* at 54. Petitioner would "pull them by the hair," "hit them on the shoulder," and call them "stupid." *Id.* at 54–55. This abuse began when the children were in kindergarten and happened "several times" over the two years preceding the departure from Mexico, although respondent's testimony regarding the timing of the abuse was otherwise vague. *Id.* at 54, 65. Respondent said the children would also see their father in a drunken state, which would scare them. *Id.* at 56. Respondent said that Minor A would tell petitioner "not to drink" and "would hide under his bed when he was drinking." *Id.*

In July 2024, petitioner physically abused respondent for the last time before she departed Mexico two months later. *Id.* at 53. According to respondent, she spent the day working at the business run by petitioner's parents, and she received word while there that petitioner wanted her to come home at the end of the day with a specific type of treat for the family dog. *Id.* Respondent returned home with a different dog treat. *Id.* She continued – again, growing quite emotional:

> When I got home, he told me that those were not the treats that he wanted and he was furious. And he started complaining about it. I tried to explain to him that it was a long way from home and that I would have had to walk a lot more [to get the preferred treats]. The road from the business to the house was very long, but he didn't care about it.
>
> He started hitting me, grabbing me by my neck, and threw me against – threw me up against the wall in the kitchen. He covered my face and my mouth so that I would not continue to speak. With his feet he kept kicking me to my body, hitting me with his knees. He threw me down to the ground and he started kicking me. And the kids were present and they started screaming and crying very loudly. And I started bleeding from my nose and my mouth. He finished up and went to the room and the kids helped me get up while they were crying, and they were desperate. They did not know what to do. They were screaming a lot.

*Id.* at 53–54.

According to respondent, petitioner had a spotty employment record. He worked at the restaurant where the two first met for only four to five months, *id.* at 37, and then he worked for two months at a bar before the bar shut down, *id.* at 38–39. Thereafter, petitioner was unemployed for "a long time." *Id.* at 39. As of 2020, respondent said that petitioner spent his days doing "practically nothing" and, on a daily basis, drank beer "until he got drunk." *Id.* at 46–47. Petitioner also smoked marijuana at home. *Id.* at 49. Respondent said that she personally observed petitioner

5

drinking and smoking marijuana and that he engaged in these activities in front of their children. *Id.* at 47, 49.[4]

Petitioner's family was a frequent—indeed, daily—presence in the lives of respondent, Minor A, and Minor B. *Id.* at 62–63. By comparison, most of respondent's immediate family lived in the United States. *Id.* at 44, 52.[5] For that reason, respondent testified, she felt that "there was nothing I could do" with respect to reporting petitioner to the police, *id.* at 52, and she worried that petitioner would exact revenge on her if she made a report, *e.g., id.* at 65. Respondent sought to substantiate this fear with testimony that petitioner once threatened to kill a co-worker. *Id.* at 94–95; *see also id.* at 89 (according to respondent, petitioner has "dangerous contacts"). Still, respondent testified that she told petitioner's parents and sister about the abuse. *Id.* at 52.

Respondent conceded that she did not report any abuse to the police or seek relief from a Mexican court. *Id.* at 63, 65. She conceded that—despite the fact that, per her testimony, petitioner's abuse of Minor A and Minor B left them with bruises— she had no photographs of these bruises to substantiate her claims. *Id.* at 65. Nor did respondent seek medical attention for Minor A and Minor B as a result of the alleged abuse, *id.* at 65–66,[6] or alert the children's school to any injuries that they sustained as a result of petitioner's actions, *id.* at 67. She admitted that no teacher ever reported seeing bruises on Minor A or Minor B, but she asserted that "the bruises were on

---

[4] Respondent testified that petitioner's substance abuse led to him being arrested in 2016 and 2021, [36] at 47–49, and this testimony drew objections under Federal Rule of Evidence 404(b), [36] at 48. Under that rule, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Although the Court overruled the objection during the trial, [36] at 48, it does not consider this testimony as part of its analysis now.

[5] Respondent testified that she has three older children from a prior marriage, that they all live in Mexico, and that she has had no face-to-face contact with these children for approximately 10 years. [36] at 72–74. According to respondent, petitioner threatened her and threatened to kill respondent's older children if she tried to see them. *Id.* at 74. Petitioner denied these allegations and instead testified that respondent's older children "didn't want to see her." [35] at 142. Petitioner also testified to circumstances surrounding respondent's previous estrangement from members of her immediate family. *See, e.g., id.* at 153–54. In resolving this petition, the Court places no weight on the reasons for this estrangement as it does not bear on respondent's grave risk defense. It considers this testimony only for purposes of recognizing that respondent's most proximate familial connections while she lived in Mexico were members of petitioner's immediate family.

[6] Respondent testified inconsistently as to whether she did or did not take the children to see a medical professional after petitioner hit them. [36] at 65–67. The Court's takeaway from this testimony is that respondent did not seek medical attention for her children as a result of the alleged abuse.

6

parts of their bodies that the teachers would not have seen unless the teachers took off their clothes." *Id.* at 67–68. Respondent admitted that she never tried to leave petitioner before September 2024, despite the allegedly years-long, ongoing abuse. *Id.* at 70.

In September 2024, when respondent left Mexico with Minor A and Minor B, respondent's brother, Jorge, was visiting Mexico from the United States. *Id.* at 77; *see also id.* at 112 (petitioner's sister testified that respondent told her that Jorge was visiting Mexico around the time respondent and the children left Mexico); [35] at 155-56 (similar testimony from petitioner). Respondent has resided in Aurora for approximately one year. [36] at 34. She lives there with Minor A, Minor B, respondent's mother, brother, and a cousin. *Id.*

### C. Petitioner's Testimony

Petitioner is a 37-year-old man who has lived in Naucalpan de Juarez, Mexico, for nearly all his life. [35] at 131. Consistent with respondent, petitioner testified that he and respondent lived in his parents' home when respondent was pregnant with Minor A. *Id.* at 134. Petitioner described that pregnancy as "high risk" and Minor A as "God's miracle." *Id.* at 135.

Also consistent with respondent, petitioner testified that the family's next home was owned by his parents, although it was located in a different building. *Id.* at 135–36. In this second home, petitioner's sister lived in a separate apartment within the same building. *Id.* at 137. The two apartment are close enough that petitioner is able to hear what occurs in his sister's home. *Id.* According to petitioner, his sister and respondent shared a close enough relationship that, in his view, respondent would feel comfortable confiding in petitioner's sister. *Id.* at 139–40, 170. Still, as far as petitioner knew, respondent never told his sister about any violence in their relationship. *Id.* at 139.

The family's second home was quite close to the home of petitioner's parents and, as a result, petitioner's mother saw respondent, Minor A, and Minor B "almost daily." *Id.* at 142–43. According to petitioner, his mother's relationship with respondent was "very good"; his mother loved respondent "like a daughter"; and that on one occasion, petitioner's mother said respondent "was worth more in that home than [petitioner]." *Id.* at 143–44. Respondent once confided in petitioner's mother about an unspecified matter involving petitioner and, in response, petitioner's mother "scold[ed]" petitioner. *Id.* at 144. But according to petitioner, respondent never told his mother that he had been violent with respondent. *Id.* at 171.

As a general matter, petitioner described a happy home life with respondent and their children—one in which they celebrated birthdays and religious occasions with family members, and celebrated respondent's birthday at a water park. *Id.* at

132–34, 146–51. Inconsistent with respondent, petitioner described a robust work history. He described a series of jobs at restaurants and a racket club and testified that he worked very long hours. *Id.* at 136–37, 140– 41. Also contrary to respondent, petitioner denied ever being fired from a job after threatening to kill his boss. *Id.* at 137; *compare with* [36] at 37. Petitioner was working on the day that respondent left Mexico with Minor A and Minor B and (contrary to respondent's testimony, *see id.* at 75), he was not fired from that job the following day, *see* [35] at 155.

Petitioner disputed respondent's version of their July 2024 fight. In petitioner's view, they "had a very strong argument." *Id.* at 163. It began, petitioner said, when respondent arrived late and complained that petitioner had not washed the dishes. *Id.* According to petitioner, respondent called him "stupid." *Id.* Petitioner, "in [his] intent to be contrarian," then criticized respondent's choice of dog treats because they were too expensive. *Id.* He continued:

> She had a glass in her hand, and she threw it at my face. That's why I got up and grabbed her from her shoulders. She scratched my face, and then she started screaming.
>
> I told her to be quiet, because the kids were in the bathroom checking out their phone, and she … continued to be kicking and fighting, and the one who hit me with the knee was her.
>
> I picked her up. I embraced her and picked her up, and I threw her to the ground, and I told her to calm down.
>
> And she continued to be kicking and slapping. I was trying to control her, and she started screaming. That's when the kids found out about it and came out to where we were.
>
> After that, we separated from each other, and then I went over to the kids and pulled them over to the room, because I wanted them to get away from that.
>
> She came running into the bedroom, and she said, "Leave my kids alone."
>
> … I told her: "You know, I'm trying to calm the kids down, so you better calm down. I need for you to be calm."
>
> And she stood right in the middle of the entrance to that room and yelled at me: "You will regret this for the rest of your fucking life."

8

*Id.* at 164. Petitioner added that he did not punch, kick, or choke respondent during this incident and that she did not call the police or go to the hospital following it. *Id.* at 165.

Petitioner described no other violent interactions with respondent and denied ever sexually assaulting, punching, kicking, or slapping respondent. *Id.* at 166–70. He instead described respondent as the one in the relationship who insulted him, including in front of their children, with terms such as "stupid" and "son of a bitch." *Id.*; *see also id.* at 171. Otherwise, petitioner said he and respondent would "argu[e] and fight, just like any other couple, because sometimes [they] were short on cash." *Id.* at 166.

Petitioner acknowledged using physical force to discipline his children. *Id.* at 173. On one such occasion, Minor B slammed a door with force, but before the family's dog—which had a long tail—was able to clear the doorway. *Id.* As a result, some centimeters of the dog's tail were cut off. *Id.* Petitioner "spanked [his] son twice at that very moment," but also testified that he understood the difference between hitting a child in anger and physically disciplining a child. *Id.* Petitioner denied referring to the children with any "demeaning or abusive names." *Id.* at 174. He also denied ever drinking alcohol in the preceding two years and said he has only been intoxicated around his children on one occasion. *Id.* at 175–76.

After respondent left Mexico with Minor A and Minor B, petitioner went to great lengths to locate them. He spoke with law enforcement, searched hospitals, and even searched morgues. *Id.* at 158–59. Petitioner did not know where his children were for approximately one year. *Id.* at 159. He had no communication with them or respondent during that year either. *Id.* at 160.

At trial, petitioner's counsel asked petitioner if he would be "okay" with respondent "living somewhere else rather than in [his] home" if respondent and the children returned to Mexico. *Id.* at 176. Petitioner responded:

I'm going to be honest in response to that question.

… I seek the benefit of the children before – above Erika's benefit, above my benefit. They come first. They need their father and their mother.

If I have to build an independent bedroom in my own home, as long as the kids are okay, I'm willing to do that up until a certain point. I consider Erika to be brave, and she's the mother of my children.

*Id.*

9

### D. Testimony from Petitioner's Sister

Petitioner's 35-year-old sister is Shirinca Elena Garduño. [36] at 101. She and petitioner (and respondent, Minor A, and Minor B, when they lived in Mexico) reside in the same house, although in different apartments. *Id.* at 102. The apartments are close enough that she can see and hear petitioner from her home. *Id.* at 103. Petitioner's sister works from home every weekday. *Id.* at 102.

Petitioner's sister saw and spoke with the children and respondent every day. *Id.* at 104. She and respondent would "sit down and talk three to four times a week" and "share meals and dinner." *Id.* During their conversations, respondent never told the sister that she or the children were afraid of petitioner. *Id.* at 105. Petitioner's sister described her brother as a loving, affectionate, and playful father. *Id.* at 107. Petitioner's sister acknowledged seeing bruises on Minor A and Minor B, but testified that "they will explain to me … it was for playing reasons and not for other situations." *Id.* at 108. *See also id.* at 114–15 (according to petitioner's sister, one of the children is "pretty active and he would have bruises and he falls fairly frequently or he'd say I fell and I hit myself on the steps or on some stones").

According to petitioner's sister, when petitioner, respondent, Minor A, and Minor B lived in the neighboring apartment unit, she never saw "fighting or yelling or arguing"; was never aware of police being called to the apartment unit; and never heard petitioner yell at his children other than "just playing around." *Id.* at 103. She never heard petitioner call the children anything inappropriate or witness any violent interactions among them. *Id.* at 108–09.

Petitioner's sister testified that the last time she saw her brother drink was "one or two years ago" when he had "one or two drinks" but that he has been sober for about two years. *Id.* at 110. Respondent, Minor A, and Minor B never expressed concerns to petitioner's sister about his drinking. *Id.* at 110–11.

Petitioner's sister described petitioner and respondent as individuals who "got along very well" and who "had good communication." *Id.* at 106. She never saw petitioner hit, choke, kick, threaten, or insult respondent. *Id.* at 106–07. She never saw them argue. *Id.* at 106. According to petitioner's sister, any conflict she may have witnessed were "[j]ust marriage problems." *Id.* at 107.

### E. Testimony from Petitioner's Mother

Petitioner's mother, Rosamaria Piña Jimenez, testified that she and respondent used to speak daily and "could talk about just about everything." [35] at 185. The two discussed petitioner, but respondent never said that petitioner hit or sexually assaulted her, or that petitioner drank too much alcohol. *Id.* at 188, 192.

10

Petitioner's mother never saw bruises or marks on respondent's face or neck. *Id.* at 189.

Petitioner's mother described respondent and petitioner as individuals who "had good communication" and "got along well together." *Id.* at 186. Although she witnessed "moments of disagreement because of different ways of thinking," she never saw petitioner hit respondent or their children "in terms of violence or aggression." *Id.* She acknowledged that petitioner physically disciplined the children on occasion. *Id.* at 186–87, 189. She testified that petitioner did not call the children by inappropriate names. *Id.* at 191. And neither child ever told their grandmother that they feared their father. *Id.* at 190.

### F.  Report and Testimony of Guardian Ad Litem Concerning Minor A

In December 2025, the Court appointed Stacey Platt as a guardian ad litem for Minor A. [32]; [36] at 4.[7] The parties jointly selected Platt to serve in this role, and she provided her time and services on a pro bono basis. [36] at 4.

---

[7] Respondent originally intended to call Minor A as a witness at trial. During pretrial proceedings, the Court expressed concerns about this plan because of Minor A's age, limited English-language proficiency, and the inevitable stress and anxiety Minor A would experience testifying in a formal judicial proceeding about difficult topics. The parties acknowledged the legitimacy of these concerns. The Court also declined to conduct an *in camera* interview of Minor A for two primary reasons. First, the parties represented that Minor A was not proficient in English, and the Court does not speak Spanish. The Court therefore doubted its ability to effectively interview Minor A—including to execute successfully the nuanced task of assessing credibility in a child—while working through an interpreter. Second, respondent's grave-risk defense was premised on allegations that petitioner had abused her and their children. The Court is not trained to interview children on such sensitive topics. After the Court raised these concerns with the parties, it recommended that the parties meet, confer, and select a guardian ad litem to interview Minor A. The parties then selected Platt. The relevant discussions among the Court and the parties took place at a December 2, 2025 hearing [28]; at a December 4, 2025 hearing [29]; and at the trial, [36] at 4–24. In those discussions, the Court addressed the scope of the appointment, the number of times Minor A would be interviewed, where the interviews would take place, what testimony and materials the parties would make available to Platt, and the timeline for Platt's work. Platt was later cross-examined, including about all the work she did *not* do as part of her appointment (e.g., interview the parties and collateral witnesses, conduct a home visit, investigate the possibility that respondent could return to Mexico but live apart from petitioner, etc.). *See, e.g.*, [40] at 16, 29–31, 34–38, 57–58. Neither party asked that Platt's appointment be broadened to include this work. Rather, throughout this matter, petitioner expressed an interest that the case, including Platt's work, proceed quickly (as is consistent with the Convention). At the December 4, 2025 status hearing, petitioner's counsel expressed particular concern that a wide-ranging investigation by a guardian ad litem could extend up to several months.

Platt is a clinical professor of law at Loyola University Chicago's School of Law and associate director of its ChildLaw Center and Clinic. Her complete resume has been filed on the docket. [39]. Platt is proficient in the Spanish language. [36] at 99; [40] at 21, 64–65 (Platt explains that "[s]traightforward Mexican Spanish is something that I feel very comfortable with" and that she was "very happy with [her] level" of communication with Minor A). She has extensive training and experience interviewing children on issues related to domestic violence, child abuse, and child neglect. [39] (Platt's resume); [40] at 23 (Platt has "over really 40-plus years of [experience] interviewing children"); *see also id.* at 24, 72. She has served as a guardian ad litem in Hague Convention matters in other cases in this District and has been trained on the Hague Convention as well. [36] at 5; *see Hulsh v. Hulsh*, No. 19 C 7298, 2020 WL 11401634, at *1 (N.D. Ill. July 21, 2020).

By agreement of the parties, Platt's appointment was for a limited purpose: so Platt could "assess Minor Child A regarding (a) Respondent's affirmative defense of grave risk of harm, and (b) Minor Child A's credibility, and to offer opinions regarding the same." *Id.*[8]

To achieve this objective, the parties agreed that Platt would interview Minor A; review any background documents she deemed relevant; and prepare a report for the Court's consideration. *Id.*; [38] (under-seal copy of Ms. Platt's report). Platt also observed the trial testimony of petitioner and respondent, [40] at 7, and testified herself as well.

Platt interviewed Minor A on two occasions. [40] at 7–8. Both interviews took place at a neutral location: Platt's office. *Id.* at 34. The first meeting lasted one hour and 45 minutes; the second meeting lasted approximately 30 to 40 minutes. *Id.* at 7–8. Platt's discussion with Minor A "related to life in Mexico, a little bit about life here, phone calls with dad, and issues related to the grave risk defense." *Id.* at 8. The interview was conducted mostly in Spanish, although Platt and Minor A also used some English as well. *Id.* at 18; [38] at 2. Platt asked open-ended rather than leading questions, [40] at 21–23; took notes during the interview, *id.* at 69; and Minor A wrote down some of his answers as well, *id.* at 67. The interview was not audio- or video-recorded or otherwise transcribed. [40] at 16, 22–23. A few days following the interviews, Platt prepared and submitted her report. [38] at 1. In preparing her report, Platt used all of her notes and "in particular … took care to make sure that

---

[8] With respect to the second purpose, the Court clarified for Platt that it was not asking her to advise on whether Minor A's testimony was consistent with the testimony of other witnesses or was otherwise corroborated by evidence. Rather, the Court sought Platt's expertise on whether Minor A's tone, use of language, demeanor, and behavior during his interactions with Platt were consistent with those of a nine-year-old child or whether they indicated potential alienation or other issues bearing on Minor A's credibility (e.g., his developmental capacity). *See generally* [36] at 14–21.

any content the child provided that was reflected in [her] notes was also included in the report." [40] at 70.

What follows is a summary of the report, interspersed with relevant portions of Platt's in-person testimony.

Minor A told Platt that "he, his brother, and his mother left Mexico because his father hit his mother." [38] at 2. Platt's report continues:

> Child A described a pattern in which father would drink beer, get angry, argue with his mother, yell at her, call her bad names ("groserias") such as stupid ("babosa"), damned ("maldita"), and useless ("inutil"), then throw her on the floor and kick and hit her repeatedly. When asked about the frequency, Child A said this happened "all the time" and "one day yes and one day no."

*Id.* On one occasion, Minor A "saw his mother bleeding from the mouth after a beating by his father." *Id.*

When these incidents took place, Minor A reported that he and Minor B "would go in their room" and cry; Minor A said he would hide under his bed. *Id.* Minor A would occasionally try to comfort his mother after a beating. *Id.* Other times, he "would tell his father to stop, but his father would not stop." *Id.* According to Minor A, "[a]fter beating his mother, his father would usually go to his bed and watch television." *Id.* Minor A used dolls in Platt's office to demonstrate how his father "would throw his mother down and kick her and hit her." *Id.*; *see also* [40] at 74 ("Kicking. Kicking all over the body and hitting and punching.").

With respect to any abuse of Minor A and Minor B themselves, Minor A said his father also hit the children and "called them names when he was drinking beer or got angry." [38] at 2. Minor A distinguished between the frequency with which petitioner hit the children versus their mother. The former only took place "'sometimes,' not all the time like with his mother.'" *Id.*

In her report and during her testimony, Platt explained that Minor A had difficulty with the concept of "frequency." *Id.* at 4; [40] at 9, 19–20, 39–40. As Platt later expounded: "[I]f I ask a child who is 6 or 7 or 8, they may have [a] very good memory of something that happened, but they may not be able to tell me how often that happened." *Id.* at 39–40; *see also* [38] at 4 ("These limitations are not unusual for a newly nine-year-old boy."). On the issue of frequency, the Court had the following colloquy with Platt:

> Court:      And what about with respect to frequency? So as I
>                 understand it, there's difficulty pinpointing when

13

> something happened, but then a question of how often did something happen.

> Platt:     Yes.

> Court:     Can you speak a little bit more about limitations on Child A's ability to answer those questions?

> Platt:     Yeah, he did fine on the allegations of abuse, which he said with respect to this mom all the time. When I asked him what all the time meant, he said one day yes, one day no. One day yes, one day no.

> Court:     You understand that to be his definition of all the time?

> Platt:     Yes. And then when he talked about with him and his brother … he was a little less clear. Sometimes that happened. Sometimes when he drank, sometimes when he drank and had no reason, he would just lose his temper. But he had a little bit of a harder time saying how often that happened.

*Id.* at 40–41. Platt continued:

> The one thing he did say with respect to frequency is that his dad would drink and get mad and call them names, and then sometimes he would hit them without having any reason, just because he drank the beer. … But I definitely had the sense from this child that the bigger concern was the exposure to domestic violence against the mother.

*Id.* at 42. In a later portion of her testimony, Platt added:

> This child was very concerned about what he witnessed [with the mother]. And with respect to himself and his brother, it was more concern over fairness. … Yes, he would drink, and then for no reason he would hit us. You know, there would be no reason at all … he didn't have a rationalization for it.

[40] at 74–75.

Per Platt's report and testimony, Minor A distinguished between instances when his father hit him "for no reason when he was drinking" and instances when his father hit as a form of discipline. [38] at 2. Like petitioner, Minor A described the incident when Minor B accidentally lopped off a portion of their dog's tail. *Id.*

14

According to Minor A, in response, petitioner hit Minor B on his head and called Minor B "stupid." *Id.* Minor A explained that he "was not scared or angry when his happened," and that his father did not call Minor A "stupid," presumably because Minor B was solely responsible for the dog's injury; but added that petitioner called both Minor A and Minor B "damned and useless when he was drunk and/or angry." *Id. See also* [40] at 41–42, 54–55.

Minor A told petitioner's mother and sister "many times about what his father was doing, and they told him they would tell his father to stop, but it never stopped." [38] at 3. Minor A's "grandmother even told his father once in front of the children to stop drinking and hitting, but it still never stopped." *Id.* Platt later testified: "[F]or me what was relevant is that the child was essentially saying that he was asking people for help. People who loved him and cared for him, he was asking them for help, and that nothing ever changed." [40] at 53.

Minor A expressed fear about returning to Mexico because respondent would "have to ask [petitioner] for help." [38] at 3. Platt understood this reference to "help" to be a reference to financial assistance. [40] at 56–57. And, indeed, Minor A told Platt that he heard his parents arguing about money. [38] at 3. But "[w]hen asked to compare his concerns about money/food and hitting," Minor A "said he would be worried about both if they returned to Mexico, but more about being hit and his mother being hit." *Id.*; *see also* [40] at 56–57 ("[H]e was most concerned about his mom getting hit, and he also expressed concerns about himself getting hit.").[9]

Minor A recounted some of the same occurrences as petitioner, such as the family trip to the water park and another occasion when petitioner and the children jumped on the bed right after respondent had made it, which upset respondent. [38] at 3; *see also* [35] at 167–68. In talking about life in Mexico, Minor A "was able to recall good times and bad." [38] at 3. Minor A also told Platt that he missed his father and liked talking to him by phone. *Id.* The report, however, continued:

> [Minor A] would not want his father to visit him in Aurora because he is afraid his father will take him away and hit him again. If his father tried to take him away, [Minor A] would call the police. [Minor A] said he would like to go to Mexico when he is 14, but just for a visit with his father. He would go for that year and return to the United States. His father could not hit him because he would be too big by then.

*Id.*

---

[9] *But see* [40] at 36 (on cross-examination, Platt acknowledged that she "really [didn't] know" if economically better living conditions in the United States might influence Minor A's relative desire not to return to Mexico).

Minor A told Platt that in his current living situation "no one drinks," *id.* at 4, and he "is relieved that there's no family violence," [40] at 35.

During her interview, Platt asked Minor A to name one thing he wished for and, in response, Minor A asked for three wishes. [38] at 4. After Platt granted that request, Minor A wrote out three wishes: "1. Eliminate beer all over the world"; "2. Do not hit women."; and "3. Do not say rude things ("groserias"). *Id.*

Platt offered the following general impressions of Minor A. He was "focused on [her] questions" and was able to answer them "promptly and conversationally." [38] at 1. He was able to "maintain attention," had "strong" eye contact, and bore a "serious and grave" expression "when he described some aspects of his life in Mexico." *Id.* His "attention span and detailed descriptions were impressive," and "[h]is language was age appropriate," *Id.* at 4. Platt testified: "This child was older than his age in some ways and younger than his age in some ways, like every child." [40] at 20. She described Minor A as "sincere." *Id.* at 60.

Platt further described Minor A's memory as "strong," adding that "[h]is detailed accounts of life in Mexico were consistent over two meetings." [38] at 4. At trial, Platt acknowledged that she had been tasked with asking Minor A—only recently nine years old—to recollect events that had taken place a year or more earlier. [40] at 49. Platt explained that Minor A would have been six or seven years old at the time of relevant events and, based on her training and experience, that would have been well past the age when "children begin to have more reliable memories. *Id.* at 49–51. *See also id.* at 60 (Platt explained that she "did not see" an indication of "implanted memories" in this case).

During her interviews of Minor A, Platt assessed the possibility that Minor A had been coached by respondent or by another family member in the United States. She asked him, for example, "if anyone told him what to tell me" with a specific focus on Minor A's mother and maternal grandmother. [40] at 10. Platt stated that Minor A "knew he was coming to tell [Platt] about his life in Mexico" and knew Platt "would share what he told [her] with the judge." [38] at 2. Minor A understood that "a judge is a person who decides things when people have an argument or issue." *Id. See also* [40] at 46.

In her report, Platt wrote that "nothing in [Minor A's] presentation suggested coaching." [38] at 4. Platt continued:

> [H]is accounts were responsive and unchanging, his eye contact was consistent, his affect was appropriate to content, and importantly, he recounted not only negative, but also positive aspects of his relationship with his father, evidencing a fullness of understanding and memory, rather than a black and white strategy.

16

*Id.*

Platt expounded on this last point in her testimony. She said "there was nothing in [her] interview with this child whatsoever to suggest any kind of alienation," meaning there was no indication that respondent had gone on a "campaign" to alienate Minor A from petitioner. [40] at 30, 32. Platt continued:

> [T]he child was very fulsome in his remembrances of his family. … [H]e enjoys speaking with his father, he loves his father, he wants to see his father again. He's afraid for his father to come here, and he's afraid of being forced back. He talked about this plan that when he gets a little older and bigger and no one can hit him that he would go back and visit.

> And so when a child is able to feel both the sad part and the difficult part and also the really positive part, it's a suggestion that the child is not being … forced or manipulated. Often when a child is really being manipulated, they kind of have a job to do. You can get that sense. They want to get out of your office as soon as possible. They cannot see the gray. They can only see the black and white. …

> …

> … I felt like this is a very loving child who really loves both of his parents …. I thought he was very forgiving and very loving about his dad, and I don't think he's alienated for that reason.

[40] at 32–33; *see also id.* at 34 (Minor A demonstrated "an integration of both positive and negative, which is what we all have when we're not being manipulated").

### G. Documentary Evidence

The Court admitted into evidence several photographs of Minors A and B, respondent, petitioner, and other family members. As a general matter, the photos depicted family events, such as birthdays and religious celebrations. *See* [35] at 132–34, 146–50. None of the photos depict the children with any bruises.

## II. Findings of Fact

For the reasons that follow and based on the record before it, the Court finds that respondent has established by clear and convincing evidence that petitioner physically and psychologically abused respondent, Minor A, and Minor B.

In making its findings of fact, the Court wholly sets aside the testimony of petitioner's mother and sister. "The trier of fact must decide whom to believe (and

17

how much to believe) on the basis of the coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues to falsity and veracity." *See Khan v. Fatima*, 680 F.3d 781, 785 (7th Cir. 2012). Such clues include a witness's "demeanor and facial expressions," "potential for bias," and "the believability of the witness' testimony in light of the other evidence presented." *Ho*, No. 20 C 6681, 2021 WL 2915161, at *1. The Court does not credit the testimony from petitioner's mother and sister in light of these witnesses' demeanor, tone, potential for bias, and the implausibility of their narratives in light of the other evidence presented.

Petitioner's mother and petitioner's sister did not testify in a credible manner. They testified in detached and blank tones. They often provided short, clipped responses. *E.g.*, [35] at 185 (answering "yes," "no," and "no," respectively to questions asking whether petitioner is "a good father," "a violent person," and "an angry person"). They did so even when asked questions that portrayed the petitioner—their son and brother, respectively—as an abusive and violent alcoholic. Certainly, credibility does not hinge on a witness's ability to shed tears. But based on their tone and demeanor, the Court was left with the strong impression that the testimony from petitioner's mother and sister was more rote and rehearsed than it was candid.

The Court's adverse credibility determinations with respect to petitioner's mother and sister are unaffected by the fact that these witnesses testified via remote means and through interpreters. So did petitioner and respondent. The Court does not credit every line of testimony offered by petitioner and respondent (as it explains further below). Still, it does not find that their credibility was compromised for reasons related to demeanor or tone, i.e., factors that might be harder to assess when testimony is not provided in-person and/or in a foreign language. Put another way: petitioner and respondent were still able to convey earnestness—even while testifying via WebEx and an interpreter. The same was not true for petitioner's mother and sister.

In declining to credit the testimony of petitioner's mother and sister, the Court further relies on the following observations. Petitioner admitted that he and respondent would fight on occasion, both verbally and physically (although in petitioner's view, these fights did not rise to the level of abuse), and that respondent often insulted him using "flowery language" like "son of a bitch" and "little dick" and asking him why he didn't "just die." [35] at 171. In contrast, petitioner's sister insisted that she had never even heard the couple argue, even though they all lived in close proximity to one another and interacted with each other daily. *E.g.*, [36] at 103 (petitioner's sister testified that she lived in the same house as petitioner and respondent, just in a separate apartment unit; that she can see and hear petitioner's family from her unit; and that she had "never" seen petitioner and respondent "fighting or yelling or arguing"). For her part, petitioner's mother described respondent and petitioner as individuals who "had good communication" and "got

18

along well together." [35] at 186. These witnesses insisted on black-and-white answers when even petitioner was willing to acknowledge the gray. In so doing, they irreparably compromised the integrity of their testimony.

The Court now turns its attention to petitioner's testimony, which the Court credits in several respects. For instance, the Court credits that petitioner had a strong history of employment. His testimony on that point was supported with credible details such as the names of particular employers, the hours he worked, and the length of his tenure at each establishment. Conversely, the Court does not credit respondent's testimony that petitioner was unemployed for long stretches of time and that he was fired from one job in September 2024. Respondent had already left Naucalpan de Juarez by the time this purported firing took place, and respondent did not have any contact with petitioner for approximately one year following her departure. She therefore had no personal knowledge of this purported firing.

The Court also does not credit respondent's testimony that the petitioner threatened to kill a former co-worker; that petitioner threatened to kill respondent if she saw her children from her previous marriage; and that petitioner had dangerous contacts. None of that testimony was substantiated, and it struck the Court as embellished. The Court therefore credits petitioner's testimony to the contrary on these points. *See also supra* at note 5.

The Court credits petitioner's testimony that his relationship with respondent included at least one violent altercation, which took place in July 2024. Respondent testified to this altercation as well. Of course, there are differences in the parties' versions of events. For example, in petitioner's version, respondent was the instigator; in respondent's version, the petitioner was. For the following reasons, the Court credits (1) respondent's account of the July 2024 altercation, and (2) respondent's testimony that this was not the first time in their relationship that petitioner had been both physically and psychologically abusive toward respondent.

*First*, the Court does not credit petitioner's testimony that he has not drunk alcohol in the preceding two years and has only been intoxicated around his children on one occasion. By comparison, according to respondent, petitioner got drunk "almost daily," *see* [36] at 47, and according to Minor A, petitioner's consumption of alcohol was a catalyst for abuse, *see* [38] at 2. Petitioner admits that in September 2024, Minor A left him an audio message in which the child asked petitioner "not to drink too much beer." [30] ¶ 22. A child would not have left such a message were the child not accustomed to seeing his father "drink too much beer." Nor would a child— when given the opportunity to name three wishes—say that his first wish would be to "[e]liminate beer all over the word" had this child not been exposed to the negative effects of overconsumption of alcohol. [38] at 4. Petitioner's insistence that he has not even drunk any alcohol in the last two years of his life is therefore not credible and,

by extension, undermines his testimony about the nature of his relationship with respondent and his children.[10]

*Second*, the Court does not credit petitioner's testimony that, had he been abusive, respondent would have confided her fears and her children's fears to petitioner's mother and sister. Respondent testified that she *did* tell petitioner's mother and sister about the abuse and that the petitioner's family witnessed the psychological abuse as well. [36] at 50, 52. Minor A told these relatives about his father's abuse as well. [38] at 3. But petitioner's mother and sister appear to have ignored these reports or downplayed them. Petitioner's mother only "scolded" petitioner. [35] at 144. And even though both petitioner and respondent testified that ugly insults were common in their home, petitioner's sister said her brother and respondent "had good communication" and chalked up any conflict to "[j]ust marriage problems." *Id.* at 106–07. The Court therefore finds that petitioner's mother and sister were aware of the abuse and does not credit petitioner's testimony that no reports were ever made. In addition, given the shame and stigma associated with domestic violence, it is unsurprising that respondent would not report the abuse to anyone outside the family, including law enforcement. *See Van De Sande v. Van De Sande*, 431 F.3d 567, 570–71 (7th Cir. 2005) ("There is a difference between the law on the books and the law as it is actually applied, and nowhere is the difference as great as in domestic relations [due to] the privacy of the family.").

*Third*, the Court credits the information provided by Minor A via Platt's report and testimony. Through Platt, Minor A stated that petitioner hit respondent, Minor A, and Minor B and that petitioner did so when he was inebriated. Minor A's statements are consistent with his mother's testimony, and they are corroborated, to some degree, by his father's admission that a violent altercation took place between him and respondent in July 2024.

The Court was struck by the consistent way Minor A, respondent, and petitioner described the physical abuse. Minor A told Platt that his father would throw his mother on the floor and kick and hit her. [38] at 2. This is a highly specific way to describe a clash between the parents. In comparison, petitioner testified that in July 2024, he "picked [respondent] up" and "threw her to the ground," *see* [35] at 164, and respondent added that petitioner kicked her, *see* [36] at 53–54. If Minor A were manufacturing a narrative, the Court would not expect it to align so neatly with his mother's testimony—as well as his father's.

The Court also was struck by the distinction that Minor A drew between instances in which his father used physical force to discipline the children and instances in which his father physically abused the children. Minor A appeared

---

[10] For the same reasons, the Court does not credit testimony from petitioner's sister that petitioner has been sober for two years. [36] at 110.

untroubled by the former, but he was distressed by the latter. *See supra* at 14–15. This demonstrates to the Court that petitioner was violent with his children on occasions that could not be written off as a more fathomable use of corporal punishment. *See Moreno v. Escamilla*, No. 23 CV 15736, 2024 WL 4762782, at *8 (N.D. Ill. Nov. 12, 2024) ("[I]solated incidents of corporal punishment or physical discipline do not constitute a grave risk harm.") (citing *Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 913 (N.D. Ill. 2015)).

In crediting Minor A's statements, the Court has considered (1) Platt's observations of Minor A's tone, demeanor, and eye contact; (2) Platt's extensive experience interviewing children on sensitive subjects; and (3) Platt's report and live, cross-examined testimony on issues related to the reliability of a child's memory, the possibility that Minor A had been coached by his mother or other family members, and Platt's adeptness in interviewing Minor A in his native Spanish. Having done so, the Court finds as follows: (1) Petitioner physically and psychologically abused respondent with a high degree of regularity, and (2) petitioner physically and psychologically abused Minor A and Minor B less regularly, but with sufficient frequency that the prospect of being abused by his father makes Minor A fearful about the possibility of returning to Mexico. The Court's finding that petitioner physically abused his children does not rely at all on evidence—provided by multiple sources— that petitioner used corporal punishment to discipline his children.

The Court highlights two especially persuasive statements from Minor A: First, that he wanted to return to Mexico only when he was 14 because "he would be too big by then" for his father to hit him. [38] at 3. Second, that if he were granted three wishes, Minor A would eliminate beer, domestic violence against women, and insults. Akin to a point the Court already has made, these are not statements a child would make had he not been exposed to domestic violence. These are also not statements a child would make if, as petitioner's counsel suggested during the trial, Minor A's real motive was to remain in the United States with all of its attendant "creature comforts." [40] at 35. If that were Minor A's motivation, he would have told Platt that he wanted to return to Mexico when he had enough money to buy a nicer home there. Or he would have told Platt that he wished to stay in the United States because he had more food here. But that's not what Minor A said.

With respect to the possibility that Minor A was coached or "alienated" from his father, the Court credits Platt's testimony to the contrary. The Court further observes that the first statement from Minor A that it highlighted just above— namely, that at the age of 14, Minor A would be "too big" for his father to hit—reflects an innocence and naivete that is far more likely to reflect a child's genuine state of mind than be the byproduct of coaching from an adult. Any adult knows that a 14-year-old boy is rarely all that physically imposing. But a newly minted nine-year-old is less likely to appreciate that reality.

21

In making these findings, the Court has considered petitioner's countervailing contentions, including those advanced in closing arguments. [40] at 81–105. Many of those arguments already have been addressed throughout the course of this opinion. The Court discusses some additional contentions next.

The Court recognizes that respondent has conceded that she has no photos to support her claims of abuse and that she never sought medical attention related to the abuse. At the same time, petitioner's sister acknowledged seeing bruises on Minor A and Minor B. [36] at 108. Although the sister was quick to write off the bruises as the result of child's play, her testimony (which the Court already has found uncredible for the reasons set forth above) is contradicted by Minor A who told Platt that he told "his paternal aunt *many times* about what his father was doing … but it never stopped." [38] at 3 (emphasis added). And while in the abstract it is quite plausible that an active child would sport bruises for innocent reasons, there is no basis to believe that petitioner's sister can reliably distinguish between bruises caused by an accidental fall versus bruises caused by abuse.

The Court recognizes that respondent's testimony did not feature specific dates, but that is both understandable—and not nearly as fatal as petitioner suggests, [40] at 95—when the abuse occurred regularly.

The Court recognizes that it did not hear direct testimony from Minor A nor meet with Minor A individually. Yet for the reasons the Court has already conveyed— both in this opinion and throughout these proceedings—it believes Platt provided an excellent vehicle for the Court to receive credible information from Minor A without the risk of causing Minor A undue and additional trauma. *See supra* at note 7.

The Court recognizes that respondent's testimony is not corroborated by testimony from any adult. Petitioner's counsel argued that respondent elected not to call her mother or other family members living in the United States as witnesses. [40] at 92–93. But those witnesses would not have had personal knowledge of events that took place in Mexico and, per petitioner himself, respondent was estranged from these family members for a substantial period of time. So, the utility of their testimony would have been limited.

Ultimately, based on the record before it, the Court finds that respondent has established by clear and convincing evidence that petitioner physically and psychologically abused respondent, Minor A, and Minor B.

### III.    Conclusions of Law

ICARA "provides for the return of a child wrongfully removed to the United States in violation of the Convention." *Norinder v. Fuentes*, 657 F.3d 526, 533 (7th Cir. 2011) (citing 42 U.S.C. § 11603(b)). As discussed above, the parties do not dispute

that Minor A and Minor B were "wrongfully removed" for the purpose of the Convention. Instead, the question is whether "an exception to the Convention's mandatory-return rule applie[s]." *Ortiz v. Martinez*, 789 F.3d 722, 723 (7th Cir. 2015). Specifically, whether, in light of Court's findings of fact, respondent has established that "there is a grave risk that his or her return would expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." 22 U.S.C. § 9003(e)(2)(A); Hague Convention, art. 13b. If respondent shows a grave risk, "the automatic return required by the Convention should not go forward." *Norinder*, 657 F.3d at 534. The Court concludes that respondent has made this showing.

The Seventh Circuit has instructed that "[c]oncern with comity among nations argues for a narrow interpretation of the 'grave risk of harm' defense; but the safety of children is paramount." *Van De Sande*, 431 F.3d at 572. As the language of the Convention makes explicit, this is safety from both physical and psychological harm. And while the focus of the inquiry is on the risk of harm to the children, "repeated physical and psychological abuse of a child's mother by the child's father, in the presence of the child (especially a very young child, as in this case), is likely to create a risk of psychological harm to the child." *Khan*, 680 F.3d at 787.

Here, the Court has found that that petitioner subjected respondent, Minor A, and Minor B to both physical abuse and psychological abuse. This second category includes both direct psychological harms, as when petitioner directs verbal abuse and insults to the children, and indirect psychological harms, as when the children witness their mother being subjected to physical and psychological abuse. *See id.*

The question then is whether this abuse creates a grave risk of future harm. The Court concludes that it does. At the threshold, nothing in petitioner's testimony indicated to the Court that his behavior was likely to change. Indeed, petitioner denied that he even drank alcohol, despite the more credible evidence that he drank frequently and that his drinking contributed to the abuse. The Court thus concludes that if the children are returned to Mexico, the abuse described above is likely to continue as before. *See Moreno*, 23 CV 15736, 2024 WL 4762782, at *8 ("The fact that Delgado has already struck his children in this context presents a significant danger that he would do so in the future.").

And that likelihood of continued abuse reaches a threshold of a grave risk of harm to Minor A and Minor B. "A grave risk of psychological harm is a sufficient basis, standing alone, to deny the petition for the return of the children." *Id.* (citing *Hernandez v. Cardoso*, 2016 WL 3742858, at *2 (N.D. Ill. July 13, 2016)). The Court concludes that the regular, severe abuse of the mother in front of the children is enough to meet respondent's burden. *See id.* (psychological harm sufficiently grave where "the evidence showed that the children observed repeated instances of spousal abuse that was severe enough to cause lasting distress and fear of [their father]");

23

*Hernandez*, 2016 WL 3742858, at \*2 ("Under the law of this circuit, credible testimony of spousal abuse, carried out in the presence of the child at issue, supports a finding that return of the child to the abuser poses a grave risk of at least psychological harm.") (citing *Khan*, 680 F.3d at 786).

For example, in *Hernandez*, the court credited the respondent's testimony that "Hernandez would hit her in the presence of [the minor], with the intention that [the minor] witness the abuse of his mother." 2016 WL 3742858, at \*2. This was corroborated by the minor's "credible testimony that he saw Hernandez hit [his mother]." *Id.* This evidence "support[ed] a finding that returning [the minor] to Hernandez expose[d] [the minor] to a grave risk of psychological harm." *Id.* Similarly, in *Moreno*, the Court found a grave risk of psychological harm to the children where "both [the mother] and the children described a consistent pattern of spousal abuse, both physical and verbal." 2024 WL 4762782, at \*5.

The Court also concludes that returning the children to Mexico would put them at significant risk of physical harm. As discussed above, the Court credits the testimony of respondent and evidence from Minor A that petitioner strikes Minor A and Minor B, and the Court further concludes that this violence is in addition to and separate from instance of corporal punishment described by the witnesses; for example, when Minor B was physically disciplined after accidentally amputating the family dog's tail.

Not all physical harm meets the threshold of grave risk. "The State Department [] has cautioned that 'the person opposing the child's return must show that the risk to the child is grave, not merely serious.'" *Estrada v. Salas-Perez*, 12 C 1016, 2012 WL 4503147, at \*10 (N.D. Ill. Sept. 28, 2012) (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494). "'[R]are and unusual' physical episodes—which in addition to being rare and unusual [are] not terribly severe when compared by the episodes described in reported Hague Convention cases—do not create a serious risk of physical or psychological harm, let alone a grave risk of such harm." *Id.* at \*11. For example, in *Altamiranda Vale v. Avila*, the Seventh Circuit concluded that "the contested assertion that Vale once struck his son with a video-game cord fell short of meeting this demanding burden." 538 F.3d 581, 587 (7th Cir. 2008). Likewise, *Lopez v. Alcala* concluded that there was no grave risk where the children testified that their father had hit them "once or twice" and "used corporal punishment to discipline the children in the past." 547 F. Supp. 2d 1255, 1262 (M.D. Fla. 2008).

Here, the physical abuse of the children described by respondent and Minor A is not "rare and unusual." Instead, Minor A said that while respondent is hit "all the time," he and his brother are hit "sometimes." [38] at 2. As it has already explained, the Court understands this to mean that the physical abuse of the children, while less frequent than the abuse of respondent, was still sufficiently regular. Minor A's

concern with this abuse is evident: He expressed a desire to go to Mexico to visit his father but only after "[h]is father could not hit him because he would be too big by then." *Id.* at 3. This sort of regular physical abuse, even if not constant, creates a grave risk of physical harm to the children. *Compare with Di Giuseppe v. Di Giuseppe*, 07-CV-15240, 2008 WL 1743079, at *6 (E.D. Mich. Apr. 11, 2008) ("The Court notes that Petitioner admitted while on the stand that she 'only' uses corporal punishment, and only spanking, against her children approximately two or three times a month and only when all other measures fail. The Court finds this abusive and excessive.").

This grave risk of physical harm exists even without evidence that medical treatment was required because of physical abuse. "Even where the petitioning parent has not seriously physically injured the child in the past, a 'propensity for violence,' coupled with 'the grotesque disregard' for child welfare demonstrated by committing spousal battery in the presence of children, indicates a risk that the petitioning parent will one day 'lose control and inflict actual physical injury' upon the child." *Hernandez*, 2016 WL 3742858, at *2 (quoting *Van De Sande*, 431 F.3d at 570); *see also Van De Sande*, 431 F.3d at 570 ("[G]iven Davy's propensity for violence, and the grotesque disregard for the children's welfare that he displayed by beating his wife severely and repeatedly in their presence and hurling obscene epithets at her also in their presence, it would be irresponsible to think the risk to the children less than grave."). The Court concludes there is such a propensity here, and "[t]he gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." *Van De Sande*, 431 F.3d at 570.

The Court also concludes that efforts to mitigate the risk are unlikely to succeed. As discussed above, petitioner's testimony does not give the Court assurance that he has changed his ways. The Court does not find plausible that lives of the two parents of young children could be sufficiently disentangled to reduce the risk of further spousal abuse. Indeed, when asked if he would be willing to live separately from respondent and the children, petitioner responded: "If I have to build an independent bedroom in my own home, as long as the kids are okay, I'm willing to do that up until a certain point." [35] at 176. This response displays an unwillingness to create even the sort of minimal physical separation—like living in different homes— that might mitigate the risk of future abuse. *See Moreno*, No. 23 CV 15736, 2024 WL 4762782, at *8 ("[I]f the Court were to order the children to return to Mexico, Hernandez would return with them, and this would necessarily lead to circumstances in which Delgado and Hernandez would interact in front of the children."). In closing arguments, petitioner's counsel sought to amend the testimony on this point by suggesting that petitioner "misspoke or maybe didn't completely understand the question." [40] at 103. But this is the testimony that petitioner gave in response to his own lawyer's question. Petitioner did not appear confused when he made the statement or seek clarification before providing it. And petitioner's counsel has not argued that any other portions of petitioner's testimony should be set aside owing to confusion or misapprehension.

Also in closing arguments, petitioner relied on *Souratgar v. Lee*, for the principle that "[s]poradic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." 720 F.3d 96, 104 (2d Cir. 2013); *see* [40] at 90. But, as discussed above, the Court has found the abuse at issue in the instant case is regular and significant, not isolated or limited.

Petitioner also argued that in *Habrzyk v. Habrzyk*, 775 F. Supp. 2d 1054 (N.D. Ill. 2011), "Judge Castillo addressed very similar facts" and rejected the grave risk of harm defense" because "she never went to the police to report the abuse. And … did not report that abuse to any doctors, including the child's pediatrician." [40] at 93. But the core issue in *Habrzyk* was that the Court had "found that Respondent's testimony pertaining to the allegations of abuse was inconsistent, unsubstantiated, and directly contradicted by the testimony of several neutral parties," and as a result "Respondent ha[d] failed to put forth credible evidence—let alone clear and convincing evidence—in support of her allegations that the return of the Child would put her at grave risk of harm at the hands of Petitioner." *Habrzyk*, 775 F. Supp. 2d at 1070. But the Court has concluded that respondent and Minor A's allegations of physical and psychological abuse are credible, so the evidentiary issue in *Habrzyk* is simply not present. The same is true of *Uzoh v. Uzoh*, another case on which petitioner relies. *See* 11-CV-09124, 2012 WL 1565345, at *6 (N.D. Ill. May 2, 2012) ("The mother claims the children would be at a grave risk of harm because of the father's capacity for violence. The record does not support her argument … Her testimony was implausible, and her father's testimony was based on hearsay."); *see* [40] at 94.

Finally, petitioner has suggested that the Court grant the petition but impose "concrete undertakings to ameliorate [] concerns" it may have about returning the children to Mexico. [40] at 102. Courts sometimes consider "undertakings"—or court-imposed conditions on the petitioning parent—to "ameliorate any short-term harm to the child" from return. *Van De Sande*, 431 F.3d at 571 (quoting *Feder v. Evans–Feder*, 63 F.3d 217, 226 (3d Cir.1995)). But while "[r]eturn plus conditions ('undertakings') can in some, maybe many, cases properly accommodate the interest in the child's welfare to the interests of the country," such measures "will not always do the trick." *Id.* Petitioner suggests a "no contact order" and "some form of supervised visits," as well as initiating custody proceedings in Mexico. [40] at 103.

But "undertakings are most effective when the goal is to preserve the status quo of the parties prior to the wrongful removal. This, of course, is not the goal in cases where there is evidence that the status quo was abusive." *Van De Sande*, 431 F.3d at 572 (quoting *Danaipour v. McLarey*, 286 F.3d 1, 25 (1st Cir. 2002)). And petitioner's vague suggestions of conditions lack sufficient detail to assure the Court that they would be adequate to curtail the grave risk of harm to the children, even if they would be adhered to and enforceable.

26

## IV.    Conclusion

The Court finds that respondent has met her burden by clear and convincing evidence. Because there is a grave risk that the return of Minor A and Minor B to Mexico would expose these children to physical or psychological harm, the petition for the return of Minor A and Minor B to Mexico is denied. The Clerk is directed to enter judgment in favor of respondent and terminate this civil case.

ENTER:

_____
Georgia N. Alexakis
United States District Judge

Date:  3/6/2026

27